## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| DOW CONSTRUCTION, LLC | CIVIL ACTION NO. 20-9 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| BPX OPERATING CO. | MAG. JUDGE KAYLA D. MCCLUSKY |

### MEMORANDUM RULING

Now before the Court is a partial motion to dismiss, filed by Defendant, BPX Operating Company ("BPX"). The motion has been fully briefed, including supplemental briefing. The sole legal issue for the Court to decide is whether Louisiana Revised Statute section 30:10(A)(3) applies to lessees like Plaintiff, Dow Construction, LLC ("Dow"). For the reasons below, this Court holds that section 30:10(A)(3) applies to any mineral interest owner in a forced pool unit who has no lease with the operator. As such, BPX's motion [Record Document 28] is **DENIED**.

### LOUISIANA FORCED POOLING REGIME

Under Louisiana law, the Commissioner of Conservation may join separate tracts of land into a forced pool unit[1] in which the mineral interest owners share in the mineral production from the unit. *TDX*, 857 F.3d at 257 (citing La. R.S. §§ 30:9(B), 30:10(A)(1)). The stated purpose of pooling orders in the statute is to "afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool."[2] La. R.S. § 30:10(A)(1)(a). The

---

[1] Forced pooling is meant to prevent waste and "allows the government to authorize a single operator to drill for oil and gas even when all parties possessing oil and gas interests in the drilling area have not agreed to go forward." *TDX Energy, LLC v. Chesapeake Operating, Inc.*, 857 F.3d 253, 256 (5th Cir. 2017).

[2] An owner is defined as a "person . . . who has or had the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." La. R.S. § 10:3(8). "A lessee of oil and gas rights," such as Dow, "falls within this definition." *TDX*, 857 F.3d at 257–58 n.7.

Commissioner appoints an operator, and the "operator is responsible for drilling within the unit but pays a proportionate share of production to owners of oil and gas interests for any acreage on which the operator does not have an oil and gas lease." *TDX*, 857 F.3d at 257–58 (citing La. R.S. § 30:10(A)(1)(b)). The non-operators must also share in certain drilling risks and costs. *Id.* at 258. "Each oil and gas interest owner is responsible for a share of development and operation costs." *Id.* (citing La. R.S. § 30:10(A)(2)). "To prevent free riding, the statute creates a mechanism for sharing the risk that a well, once drilled, will not produce enough to cover drilling costs." *Id.* After the operator sends notice to certain owners, the owners may choose to "participate in the risk by contributing to drilling costs up front" or choose not to participate and be subject to a risk charge, which the operator can deduct from the non-participating interest owners' share of production. *Id.* (citing La. R.S. § 30:10(A)(2)(a)(i), (b)(i)). However, completely unleased interest owners are exempt from this risk charge. *Id.* at 263 (citing La. R.S. § 30:10(A)(2)(e)(i)).

Additionally, the operator is required to share information, upon request, with mineral interest owners who have no lease with the operator pursuant to Louisiana Revised Statute section 30:103.1. *Id.* at 258. Section 103.1 requires the operator to provide an accounting of costs to the non-operators. *Id.* at 263. The "report has to relate the cost to the benefit: it must tell the unleased mineral owner what it is getting for its money." *Id.* (citation omitted). Louisiana Revised Statute section 30:103.2 provides that when an operator fails to timely provide this information, such operator loses the "right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well." La. R.S. § 30:103.2.

## BACKGROUND

On January 20, 1989, Dow Mineral & Royalty Company, Inc., executed an oil and gas lease with J.R. Session and Elaine Nichols Session (the "Sessions Lease"). Record Document 23 ¶ 2. In

an assignment of rights recorded in the conveyance records on May 22, 2012, Dow acquired the Sessions Lease. *Id.* On about September 18, 2008, pursuant to a Commissioner of Conservation Order, "the HA RA SUE Unit was established as a forced pool unit for the Haynesville formation." *Id.* ¶ 3. On about October 7, 2011, Petrohawk Operating Company ("Petrohawk")[3] drilled the HA RA SUE; Nichols et ux. 11H No. 2 well (Serial No. 243945) ("Nichols Well"), which is part of the forced pool unit encompassing the Sessions Lease. *Id.* ¶ 4. "The Nichols Well was completed on January 18, 2012, and [it] produced hydrocarbons . . . until January[] 2019." *Id.* ¶ 5. BPX is the current operator of the Nichols Well, and at no point has Dow entered into an agreement with BPX. Record Documents 31 at 1, 12–13; 34 at 13–14. Nevertheless, BPX has sold Dow's share of the production and pays Dow its share of the proceeds. Record Documents 31 at 12–13; 34 at 13–14.

In its complaint, Dow alleges that it sent a demand to Petrohawk's registered agent for an accounting of costs pursuant to section 103.1. Record Document 23 ¶ 6. Dow avers that it proceeded to send a second demand for an accounting of costs after Petrohawk "fail[ed] to properly respond to the Initial Demand." *Id.* ¶ 8. Dow claims that Petrohawk failed to respond to the second demand. *Id.* ¶¶ 8, 9. As such, Dow contends that BPX—as Petrohawk's successor-in-interest—has "forfeited any right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well" pursuant to section 103.2. *Id.* ¶ 9 (internal quotation marks omitted). Additionally, Dow contends that BPX improperly deducted post-production costs from Dow's proceeds because post-production costs may not be assessed pursuant to section 10.[4]

---

[3] BPX is the alleged successor-in-interest and current operator. *See* Record Document 23, p. 3 n.3.
[4] In the Louisiana oil and gas industry, "[i]t is generally accepted that the production phase of oil and gas operations terminates at the wellhead when the minerals are reduced to possession." *J. Fleet Oil & Gas Corp., L.L.C. v. Chesapeake La., L.P.*, No. 15-2461, 2018 WL 1463529, at *6 (W.D. La. Mar. 22, 2018). Production costs generally include developing, drilling, equipping, completing, and operating the well. *See id.* at *6–9. Post-production costs, often called marketing costs, on the other hand, "are those costs and expenses incurred after the production has been discovered and delivered

Alternatively, Dow asserts that if post-production costs could be deducted, BPX forfeited that right when it failed to respond to Dow's demand letters pursuant to section 103.2.

Previously, BPX filed a partial motion to dismiss arguing that post-production costs are outside the scope of section 103.2's forfeiture provision. Record Document 7. The Court deferred ruling on that issue because the parties did not fully brief whether post-production costs may even be charged to mineral interest owners such as Dow in the first place. Record Document 15. BPX has now filed a motion to dismiss only addressing the application of section 10(A)(3). Record Document 28.

## LAW & ANALYSIS

### I.  Legal Standard

BPX invokes Federal Rule of Civil Procedure 12(b)(6) in support of its partial motion to dismiss. In order to survive a motion to dismiss brought under Rule 12(b)(6), a plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all of the factual allegations in the complaint in determining whether a plaintiff has stated a plausible claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A court may dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). If a complaint cannot meet this standard, it may be dismissed for failure to state a claim upon which relief can be granted. *Iqbal*, 556 U.S. at 678–79. A court does not evaluate a plaintiff's likelihood for success, but instead

---

to the surface of the earth." *Id.* at *6. These "'subsequent to production' costs generally include those related to taxes, transportation, processing, dehydration, treating, compression, and gathering." *Id.*

determines whether a plaintiff has pleaded a legally cognizable claim. *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "A motion to dismiss under [R]ule 12(b)(6) is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (internal quotation marks and citations omitted).

## II.   Rules of Statutory Construction

In this diversity case, the Court applies Louisiana law. To determine the substantive law of Louisiana, the United States Fifth Circuit Court of Appeals has instructed courts to look first to "final decisions of the Louisiana Supreme Court." *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206 (citing *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003)). In the absence of such a decision,

> we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case. In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana. Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.

*Id.* (citations omitted).

In Louisiana, "[l]egislation is a solemn expression of legislative will." La. Civ. Code art. 2. "The fundamental question in all cases of statutory interpretation is legislative intent and the ascertainment of the reason or reasons that prompted the Legislature to enact the law." *Pumphrey v. City of New Orleans*, 2005-0979 (La. 4/4/06); 925 So. 2d 1202, 1209 (citation omitted). "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code art. 9. "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the

law." *Id.* art. 10. "Laws on the same subject matter must be interpreted in reference to each other."

*Id.* art. 13.

> The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the Legislature in enacting it. The statute must, therefore, be applied and interpreted in a manner, which is consistent with logic and the presumed fair purpose and intention of the Legislature in passing it. This is because the rules of statutory construction require that the general intent and purpose of the Legislature in enacting the law must, if possible, be given effect. Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided. It is likewise presumed that the intention of the legislative branch is to achieve a consistent body of law.

*Pumphrey*, 925 So. 2d at 210 (citations omitted).

### III.   <u>Analysis</u>

The issue before the Court is a narrow one: whether section 10(A)(3) applies to lessees, like Dow, who have no lease with the operator. BPX has moved for partial dismissal, arguing that section 10(A)(3) is inapplicable to the facts of this case because it only applies to interest owners who have no lease at all—i.e., completely unleased. This would exclude Dow because Dow claims to be a lessee of the Sessions Lease. Dow counters that "unleased interests" as used in section 10(A)(3) means unleased as to the operator of the well, which would include Dow because Dow has no lease with the operator, BPX. For the reasons below, the Court finds that "unleased interests" as used in section 10(A)(3) means "interests unleased by the operator."

The parties have not directed the Court to a Louisiana Supreme Court decision directly on point. As such, the Court's starting point is the language of the statute itself. *See* La. Civ. Code art. 9. Section 10(A)(3) provides the following:

> If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such

> production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale.

La. R.S. § 30:10(A)(3).

The dispute centers on the meaning of "unleased interests" as used in the statute. BPX's main argument is that "unleased" means "not subject to any lease," based on the plain meaning of unleased. Record Document 28-1 at 6. However, "Title 30 uses 'unleased interests' to mean different things in different chapters." *TDX*, 857 F.3d at 262. At times, Title 30 uses "unleased interests" to mean completely unleased, and, at other times, it means unleased only as to the operator of the well. In other words, based on the surrounding context, the Louisiana Legislature includes or excludes a lessee such as Dow from the term "unleased interests." For example, section 111 uses the phrase "[o]wners of unleased mineral interests *and lessees*." *Id.* (emphasis in original) (quoting La. R.S. § 30:111). Additionally, section 10(A)(2)(e)(i) provides that the "provisions regarding a risk charge will 'not apply to any unleased interest *not subject to an oil, gas, and mineral lease*.'" *Id.* (emphasis in original) (quoting La. R.S. § 30:10(A)(2)(e)(i)). It is clear based on the clarifying language in sections 10(A)(2)(e)(i) and 111 that a lessee is excluded from the term "unleased interests." *Id.* However, the phrase "not subject to an oil, gas, and mineral lease" "would be superfluous if 'unleased interest' always meant an interest not subject to any lease." *Id.*

This reasoning led the Louisiana Third Circuit Court of Appeal to conclude that a lessee was entitled to an accounting pursuant to section 103.1 despite the phrase "owner or owners of unleased oil and gas interests" in the related forfeiture provision in section 103.2. *XXI Oil & Gas, LLC v. Hilcorp Energy Co.*, 2016-269 (La. App. 3 Cir. 9/28/16); 206 So. 3d 885, 888, *writ denied*, 2016-02181 (La. 3/24/17); 216 So. 3d 814. In *TDX*, the United States Fifth Circuit Court of Appeals adopted the Louisiana Third Circuit's conclusion in *XXI* and reasoned that unleased interests in this

context meant unleased as to the operator because of the following clarifying language in section 103.1: "lands producing oil or gas, or both, *upon which the operator or producer has no valid oil, gas, or mineral lease*." 857 F.3d at 259–62 (emphasis in original) (quoting La. R.S. § 103.1(A)). The Fifth Circuit interpreted the two statutes together and determined that the only reasonable interpretation was that "owner or owners of unleased oil and gas interests" meant "interests unleased by the operator." *Id.* Additionally, the Fifth Circuit looked to the purpose of the statute and found that there was no reason to differentiate between a lessee and a completely unleased owner when it came to who was entitled to receive an accounting from the operator. *Id.* at 262–63. Because the Legislature uses "unleased interests" to mean different things in different situations, this Court "must examine the context" of section 10(A)(3) "[t]o determine the meaning of 'unleased interests.'" *Id.* at 262 (alteration to original).

Section 10 uses the term "unleased interests" twice. As mentioned above, the first use excludes a completely unleased interest owner from being subject to the risk charge provisions. *See* La. R.S. § 30:10(A)(2)(e)(i). The term "unleased interest" was clarified by the phrase "not subject to an oil, gas, and mineral lease." *Id.* The clarifying language clearly excludes lessees. Moreover, if the phrase included lessees, the provisions about the risk charge would be superfluous because nobody would be subject to the risk charge provisions.

Section 10(A)(3) contains the second reference to unleased interests. However, the Legislature did not use the clarifying language "not subject to an oil, gas, and mineral lease" as it previously did in the same statute. Instead, section 10(A)(3) contains the following language: "*unleased interests for which the party or parties entitled to market production therefrom* have not made arrangements to separately dispose of the share of such production attributable to such tract. . . ." La. R.S. § 30:10(A)(3) (emphasis added). If the Legislature meant completely unleased in

section 10(A)(3), it would have used the excluding phrase "not subject to an oil, gas, and mineral lease" like it did a few paragraphs above in section 10(A)(2)(e)(i).[5] Instead, the Legislature omitted any language that would exclude the lessee.[6]

Importantly, the descriptive phrase, "for which the party or parties entitled to market production therefrom," appended to "unleased interests" further clarifies this term's meaning in this context. Mineral leases with a landowner typically assign the right to market production. Thus, a landowner lessee, like Dow, becomes the "party or parties entitled to market production" and who has "not made arrangements" to take its interest in kind. If the Legislature intended to limit this provision of the statute to the completely unleased interest, the descriptive phrase would be unnecessary and superfluous because the landowner of the completely unleased interest would always be the "party or parties entitled to market production." The only purpose this phrase serves is to include any party who has or has acquired the right to market production of an interest unleased by the operator. *See Pumphrey*, 925 So. 2d at 210 ("Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless.") Also, section 10(A)(3), like section 103.1, "is directed to the operator regarding *the operator's*

---

[5] BPX argues that the Legislature could have used the phrasing found in section 103.1 to clearly include the lessee. Record Document 28-1 at 8–9. Although BPX is correct, the Court finds it more appropriate to compare the language within the same statute before proceeding to a broader comparison.

[6] BPX couches this omission as the Legislature using shorthand—i.e., an omission merely to save time and space. Record Document 34 at 20–21. BPX avers that the Legislature had already defined "unleased interest" in the statute as completely unleased, so it had no need to do it again. *Id.* The Court disagrees. The definitions section of this chapter makes clear that there is no definition of "unleased interests." *See* La. R.S. § 10:3. Additionally, there is no indication that the Legislature intended to adopt the meaning of unleased interest from section 10(A)(2)(e)(i) throughout all of section 10, and, in fact, the two provisions are unrelated. Section 10(A)(3) deals with the operator's authority to sell the production when mineral interest owners have not taken their production in kind, whereas section 10(A)(2)(e)(i) addresses the applicability of the risk charge. *See also TDX*, 857 F.3d at 261 n.10 (finding that the use of shorthand was "especially clear" in sections 103.1 and 103.2 because the provisions were all related and a differing definition would distort the statutes).

obligations." *TDX*, 857 F.3d at 262 (emphasis in original). Therefore, "it makes sense that [the Legislature] would use 'unleased interest' to mean interests unleased by the operator." *Id.* "In contrast, section 111 is addressed to [unleased] owners and lessees regarding those parties' obligations. In that context, there is no reason to believe 'unleased interests' would mean interests unleased by the operator." *Id.*   Based on the context, the Court finds that section 10(A)(3) necessarily includes lessees and gives the term "unleased interests" the meaning "interests unleased by the operator."

Moreover, the Court cannot adopt BPX's interpretation of the statute because it creates an incomplete statutory scheme. Section 10 was designed to be a comprehensive quasi-contract between mineral interest owners and the operator when they have not otherwise contracted with each other after having their interests forcibly pooled together. *See generally* La. R.S. § 30:10; *TDX*, 857 F.3d at 256–58. The stated statutory purpose of a pooling order is to afford the mineral interest owner of each tract "the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense." La. R.S. § 30:10(A)(1)(a). The distribution of the pool's production is based on a pro-rata share of mineral interest ownership. *Id.* § 30:10(A)(1)(b). Thus, BPX's restrictive interpretation of section 10(A)(3) creates a hole in the law. BPX avers that based on the statute, lessees are only authorized to take their portion of the production in kind and must market the gas themselves instead of receiving cash payments. Record Document 34 at 14–19. BPX contends that section 10(A)(3) only authorizes operators to market production for completely unleased interest owners and pay the owner of said interests in cash. *Id.* BPX maintains that it does, however, have an implied right to market a lessee's interest.[7] Implicit in this argument

---

[7] Neither party disputes that BPX has the authority to market a lessee's share of production if the lessee does not take its share in kind. They dispute the source of that authority.

is the allegation that the Legislature failed to consider or expressly address the operator's and lessee's rights and obligations when a lessee does not take the production in kind and the operator proceeds with the sale of production. According to BPX's interpretation, this scenario is the only one not provided for by the statute. However, as Dow points out, BPX has been marketing Dow's share of production without a separate agreement and remitting payments to Dow in cash instead of in kind. Without the application of section 10(A)(3), BPX can point to no other provision that authorizes it, absent an agreement with the lessee, to proceed with the sale of production of the lessee's interest. The Court declines to adopt a reading of the statute that assumes the Legislature failed to consider a scenario when a reasonable reading of the statute would fill the gap. The only reading that gives section 10 the effect as a comprehensive piece of law is to interpret "unleased interests" to mean "interests unleased by the operator." Any other reading would leave section 10 with a hole regarding the rights and obligations of the operator and lessee when the lessee does not take its production in kind and the operator proceeds with the sale of production.

BPX cites to *King v. Strohe*, a Louisiana Third Circuit Court of Appeal opinion, in support of its reading of section 10(A)(3).[8] 95-656 (La. App. 3 Cir. 5/8/96); 673 So. 2d 1329. In *King*, the Louisiana Third Circuit determined that a mineral interest subject to a third-party lease was unleased pursuant to section 10(A)(3) until the lease was recorded. *Id.* at 1340. The *King* court viewed a lessee outside the purview of section 10(A)(3). *See id.* However, this Court declines to follow the reasoning of *King*. First, this Court, just like Louisiana state courts, is not bound by the single opinion of a Louisiana intermediate court. *See In re Katrina Canal Breaches Litig.*, 495 F.3d at 206. Second, *King* was based on the outdated and erroneous presumption that lessees only take

---

[8] BPX also cites to *Fite Oil & Gas, Inc. v. SWEPI, L.P.*, an unpublished Fifth Circuit opinion that has no precedential value. 600 F. App'x 239 (5th Cir. 2015). *Fite* adopts the *King* decision. *Id.* at 244–45.

their share of the production in kind, except when an order of the Commissioner authorizes cash payments to cure production imbalances. The court in *King* did not contemplate an operator proceeding with the sale of unit production without giving lessees their share of production in kind. Here, it is undisputed that BPX did just that. Additionally, there is no mineral balancing issue in this case because BPX markets and sells Dow's share of production. Section 10(A)(3) was enacted to avoid any production imbalances by allowing the operator to proceed with the sale of production when the interest owners have not made other arrangements to dispose of their shares. *See Hunt Oil Co. v. Batchelor*, 93-3144 (La. 10/17/94); 644 So. 2d 191, 200 n.16. The return obligation is that the operator must remit cash payments to the party otherwise entitled to market production of the interest, the lessee or the completely unleased owner if there is no lease. The absurd result does not come from giving "unleased interests" the meaning "interests unleased by the operator" but from allowing an operator to operate under section 10(A)(3) without subjecting the operator to the statute.

When making an *Erie* guess, the Court is convinced that *King* takes an erroneous view of the statute. The most natural reading of section 10(A)(3) is that "unleased interests" means "interests unleased by the operator." This interpretation is most consistent with the purpose of section 10 to govern situations in which an operator and a mineral interest owner have not otherwise contracted as to their rights and obligations in a forced pool unit. As such, section 10(A)(3) is applicable to the present case because Dow has no lease with the operator, BPX.[9]

---

[9] BPX's initial motion was limited to the application of section 10(A)(3). BPX did not brief whether post-production costs are incorporated into section 10(A)(3) or otherwise deductible through quasi-contractual principles. The Court is aware of *Johnson v. Chesapeake Louisiana, LP*, which is a case before another judge of this court. No. 16-1543, 2019 WL 1301985 (W.D. La. Mar. 21, 2019). The court in *Johnson* determined that post-production costs were not chargeable to completely unleased interest owners because of section 10(A)(3). *Id.* at *5. There is a pending motion for reconsideration in the matter, which the court has not ruled on. Regardless of the outcome in *Johnson*, this Court is not bound by the decision of another district court and must reach its own conclusions. At this time, the Court takes no view on the issue.

## <u>CONCLUSION</u>

Considering the foregoing reasons, the Court finds that section 30:10(A)(3) applies to any mineral interest owner who is unleased as to the operator. Based on Dow's complaint, Dow alleges that it is a mineral interest owner, as defined by the statutory scheme, and unleased as to the operator, BPX. As such, section 30:10(A)(3) applies to the instant dispute. Accordingly, BPX's partial motion to dismiss [Record Document 28] is **DENIED**.

**THUS DONE AND SIGNED** this 30th day of September, 2021.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE