## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

DOW CONSTRUCTION, LLC                        CIVIL ACTION NO. 20-9

VERSUS                                       JUDGE ELIZABETH E. FOOTE

BPX OPERATING CO.                            MAG. JUDGE KAYLA D. MCCLUSKY

### MEMORANDUM RULING

Before the Court is a partial motion for summary judgment, filed by Defendant BPX Operating Company ("BPX"). Record Document 59. The motion has been fully briefed. BPX requests the Court to make two legal determinations: (1) whether post-production costs, as defined by this Court, are properly deductible against mineral interest owners like Plaintiff Dow Construction, LLC ("Dow") and (2) whether the forfeiture provision set forth in Louisiana Revised Statute section 30:103.2 includes post-production costs. For the reasons below, this Court holds that the doctrine of *negotiorum gestio*—pursuant to Louisiana Civil Code article 2292, *et seq.*—allows operators the mechanism and ability to recover post-production costs incurred by an operator to market the mineral interest owner's share of production and that post-production costs are included in section 103.2's forfeiture provision. As such, BPX's motion [Record Document 59] is **GRANTED IN PART** and **DENIED IN PART**.

### LOUISIANA POOLING & UNITIZATION LAW

Under Louisiana law, the Commissioner of Conservation may join separate tracts of land into a single unit in which the mineral interest owners share in the mineral production from the unit. *TDX Energy, LLC v. Chesapeake Operating, Inc.*, 857 F.3d 253, 257 (5th Cir. 2017) (citing La. R.S. §§ 30:9(B) & 30:10(A)(1)). "Unitization enables the Commissioner to authorize an operator to establish an oil and gas drilling unit across multiple tracts of land, even if all owners of oil and

gas interests in the drilling unit have not agreed to pool their interests." *B.A. Kelly Land Co., L.L.C. v. Aethon Energy Operating, L.L.C.*, 25 F.4th 369, 374 (5th Cir. 2022). "The designated operator is then charged with drilling within the unit and paying a proportionate share of the proceeds of the production to the owners of mineral interests in the unit." *Id.* at 375.

"In both voluntary and compulsory unitization, well cost disputes arise. When there is an operating agreement [i.e. a contract or mineral lease] among the parties, such disputes are generally addressed in the agreement." *Id.* (citing 1 BRUCE M. KRAMER & PATRICK H. MARTIN, THE LAW OF POOLING AND UNITIZATION § 14.04 (3d ed. 2016)). However, in the forced pooling context,[1] when mineral interest owners have not contracted with the operator, the forced pooling statutory scheme "has to address a number of issues that contracts usually decide, such as how to allocate costs and risk among those holding interests in the oil and gas, and how the operator should provide an accounting of well production and costs to owners of oil and gas interests." *Id.*

In a compulsory unit, "[e]ach oil and gas interest owner is responsible for a share of development and operation costs [i.e., the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well]." *TDX Energy*, 857 F.3d at 258 (citing La. R.S. § 30:10(A)(2)). "To prevent free riding, the statute creates a mechanism for sharing the risk that a well, once drilled, will not produce enough to cover drilling costs." *Id.* After the operator sends notice to certain owners, the owners may choose to "participate in the risk by contributing to drilling costs up front" or choose not to participate and be subject to a supervision charge and risk charge, which the operator can deduct from the nonparticipating interest owner's share of production. *Id.* (citing La. R.S. § 30:10(A)(2)(a)(i) & (b)(i)). However, the risk charge does not

---

[1] Forced pooling is the term often used to describe the situation where the government orders pooling "even when all parties possessing oil and gas interests in the drilling area have not agreed to go forward." *TDX Energy*, 857 F.3d at 256.

apply to any unleased interest not subject to an oil, gas, and mineral lease—i.e., a completely unleased mineral interest owner. *Id.* at 263 (citing La. R.S. § 30:10(A)(2)(e)(i)).

Additionally, the operator is required to share information, upon request, with mineral interest owners who have no lease with the operator pursuant to section 103.1. *Id.* at 258. Section 103.1 requires the operator to provide an accounting of costs to the non-operators who request such information. *Id.* at 263. The "report has to relate the cost to the benefit: it must tell the unleased mineral owner what it is getting for its money." *Id.* (citation omitted). Section 103.2 provides that when an operator fails to timely provide this information, such operator loses the "right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well." La. R.S. § 30:103.2. As part of this dispute, BPX asks this Court to determine whether post-production costs are included as "costs of the drilling operations."

## TERMINOLOGY

The parties often use terms that differ somewhat from the vocabulary used in the jurisprudence which differs again from the vocabulary used in the Louisiana statutes. *Compare J. Fleet Oil & Gas Corp., L.L.C. v. Chesapeake La., L.P.*, No. 15-2461, 2018 WL 1463529, at *6 (W.D. La. Mar. 22, 2018) (using the terms production and post-production costs), *with XXI Oil & Gas, LLC v. Hilcorp Energy Co.*, 2016-269 (La. App. 3 Cir. 9/28/16); 206 So. 3d 885, 890, *writ denied*, 2016-02181 (La. 3/24/17); 216 So. 3d 814 (using the terms pre-production and post-production costs), *and* La. R.S. §§ 30:10 & 30:103.1 (specifying costs without using the terms pre-production, production, or post-production costs). Therefore, the Court believes it important to give a brief overview of how it will use certain terms.

In the Louisiana oil and gas industry, "[i]t is generally accepted that the production phase of oil and gas operations terminates at the wellhead when the minerals are reduced to possession."

*J. Fleet Oil & Gas*, 2018 WL 1463529, at *6. "Production costs" generally include costs related to getting the minerals to the surface, such as developing,[2] drilling, equipping, completing, and operating the well.[3] *See id.* at *6–9. "Post-production costs," on the other hand, "are those costs and expenses incurred after the production has been discovered and delivered to the surface of the earth." *Id.* at *6. These "'subsequent to production' costs generally include those related to [certain] taxes, transportation, [marketing], processing, dehydration, treating, compression, and gathering." *Id.*

## FACTUAL BACKGROUND

On January 20, 1989, Dow Mineral & Royalty Company, Inc., executed an oil and gas lease with J.R. Session and Elaine Nichols Session (the "Sessions Lease"). Record Document 23 ¶ 2. In an assignment of rights recorded in the conveyance records on May 22, 2012, Dow acquired the Sessions Lease. *Id.* On about September 18, 2008, pursuant to a Commissioner of Conservation Order, "the HA RA SUE Unit was established as a forced pool unit for the Haynesville formation." *Id.* ¶ 3. On about October 7, 2011, Petrohawk Operating Company ("Petrohawk")[4] drilled the HA RA SUE; Nichols et ux. 11H No. 2 well (Serial No. 243945) ("Nichols Well"), which is part of the

---

[2] The Court notes that the term "develop" has different meanings depending on the context. In the context of developing land, the term "contemplates any step taken in the search for, capture, production and marketing of hydrocarbons." *Broussard v. Hilcorp Energy Co.*, 2009-0449 (La. 10/20/09); 24 So. 3d 813, 820; *J. Fleet Oil & Gas*, 2018 WL 1463529, at *6–7; *see* La. R.S. § 30:10(A) ("When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the commissioner as provided in R.S. 30:9(B), the owners may validly agree by separate contract to pool, drill, and produce their interests and *to develop their lands* as a drilling unit.") (emphasis added)). However, in the context of costs, "development costs" are considered production costs and relate to "the drilling and bringing into production of wells in addition to the exploratory or discovery well on a lease." *J. Fleet Oil & Gas*, 2018 WL 1463529, at *6 (quoting Williams & Meyers, *Manual of Oil & Gas Terms* (16th ed. 2015), p. 258).

[3] As discussed below, "operating expenses" *may* carry a different definition outside the context of "operating the well" and when placed in the context of overall operations.

[4] BPX is the alleged successor-in-interest and current operator. *See* Record Document 23 at 3 n.3.

forced pool unit encompassing the Sessions Lease. *Id.* ¶ 4. "The Nichols Well was completed on January 18, 2012, and [it] produced hydrocarbons . . . until January, 2019." *Id.* ¶ 5. BPX is the current operator of the Nichols Well, and at no point has Dow entered into an agreement with BPX.

In its amended complaint, Dow alleges that it sent a demand to Petrohawk's registered agent for an accounting of costs pursuant to section 103.1; the registered agent received the initial request on October 26, 2012. Record Document 23 ¶ 6. Dow avers that it then sent a second demand for an accounting of costs after Petrohawk "fail[ed] to properly respond to the Initial Demand." *Id.* ¶ 8. Dow claims that Petrohawk's registered agent received this demand on March 18, 2013, but Petrohawk never responded to the second demand. *Id.* ¶¶ 8–9. As such, Dow contends that BPX— as Petrohawk's successor-in-interest—has "forfeited any right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well" pursuant to section 103.2. *Id.* ¶ 9 (internal quotation marks omitted). As a different argument, Dow advances that post-production costs are not even permitted to be deducted from its interest based on section 10. *Id.* ¶ 11.

## LAW & ANALYSIS

### I.    Partial Motion for Summary Judgment

BPX's partial motion for summary judgment raises two issues: (1) whether post-production costs, as defined by this Court, are properly deductible against lessee's like Dow and (2) whether the forfeiture provision set forth in section 103.2 includes post-production costs. As to the first question, the Court holds that the Louisiana doctrine of *negotiorum gestio*—pursuant to Louisiana Civil Code article 2292, *et seq.*—allows for operators to recover post-production costs incurred by an operator to market the mineral interest owner's share of production. As to the second question, the Court holds that post-production costs are included within section 103.2's forfeiture provision.

### A.  Legal Standard

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the non-movant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings and designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Id.* (internal quotation marks and citations omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the non-movant is so "weak or tenuous" that it could not support a judgment in the non-movant's favor. *Armstrong v. City of Dall.*, 997 F.2d 62, 67 (5th Cir. 1993).

Additionally, Local Rule 56.1 requires the movant to file a statement of material facts as to which it "contends there is no genuine issue to be tried." The opposing party must then set forth a

"short and concise statement of the material facts as to which there exists a genuine issue to be tried." W.D. La. R. 56.2. All material facts set forth in the movant's statement "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." *Id.*

## B.  Rules of Statutory Construction

In this diversity case, the Court applies Louisiana law. To determine the substantive law of Louisiana, the United States Fifth Circuit Court of Appeals has instructed courts to look to the "final decisions of the Louisiana Supreme Court." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (citing *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003)). The court further explained:

> [W]e must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case. In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. Jurisprudence, even when it rises to the level of *jurisprudence constante*, is a secondary law source in Louisiana. Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.

*Id.* (citations omitted).

In Louisiana, "[l]egislation is a solemn expression of legislative will." La. Civ. Code art. 2. "The fundamental question in all cases of statutory interpretation is legislative intent and the ascertainment of the reason or reasons that prompted the Legislature to enact the law." *Pumphrey v. City of New Orleans*, 2005-0979 (La. 4/4/06); 925 So. 2d 1202, 1209 (citation omitted). "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code art. 9. "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." *Id.* art. 10. "The words of a law must be given their generally prevailing meaning. Words of

art and technical terms must be given their technical meaning when the law involves a technical matter." *Id.* art. 11. "Laws on the same subject matter must be interpreted in reference to each other." *Id.* art. 13. Penal statutes should be strictly construed but not read in such a way so to distort the purpose of the law. *See White v. Phillips Petroleum Co.*, 232 So. 2d 83, 90 (La. App. 3 Cir. 1970); *M&N Res. Mgmt., LLC v. Exco Operating Co., LP*, No. 14-cv-0238, 2017 WL 8809775, at *7 (W.D. La. Dec. 13, 2017).

### C.  Post-Production Costs and Section 30:10

Now, the parties dispute whether section 10 precludes operators from seeking reimbursement of post-production costs incurred by operators after they market an unleased owner's share of production. In other words, the Court must decide whether post-production costs are properly deductible against lessees under section 10 or other principles of law.

#### 1. Relevant Statutes and Jurisprudence

As detailed above, the Commissioner of Conservation may join separate tracts of land into a forced pool unit in which the mineral interest owners share in the mineral production from the unit. "The operator is responsible for drilling within the unit but pays a proportionate share of production to owners of oil and gas interests for any acreage on which the operator does not have an oil and gas lease." *TDX Energy*, 857 F.3d at 257. "As a corollary to this scheme for sharing the benefits of unit production in the absence of a contract, Louisiana law contains mechanisms for sharing drilling risks and costs." *Id.* at 258. After the operator sends notice to certain owners, the owners may choose to "participate in the risk by contributing to drilling costs up front" or choose not to participate. *Id.* "If an owner does not participate, and the well produces, the operator can recover out of production the nonparticipating owner's share of expenditures [i.e., the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit

well, including a charge for supervision], along with a risk charge." *Id.* However, a completely unleased interest owner is not subject to the risk charge. La. R.S. § 30:10(A)(2)(e)(i).

When there is no agreement between the owner and operator, section 10(A)(3) permits the operator to proceed with the sale of production if the owner does not take in kind; if the operator avails itself of such authority, the statute also requires the operator to pay to the owner "such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale." *Id.* § 30:10(A)(3); *see generally* Record Documents 41 & 124; *Dow Constr., LLC v. BPX Operating Co.*, No. CV 20-9, 2021 WL 4492863 (W.D. La. Sept. 30, 2021).

When discussing section 10, the Louisiana First Circuit Court of Appeal, the Louisiana Third Circuit Court of Appeal, and the Louisiana Supreme Court have all held that the relationship between the operator and an unleased mineral interest owner is quasi-contractual in nature. *Wells v. Zadeck*, 2011-1232 (La. 3/30/12); 89 So. 3d 1145, 1149 ("A quasi-contractual relationship is created between the unit operator and the unleased mineral interest owner with whom the operator has not entered into contract," and "Louisiana jurisprudence provides that a claim against the operator of a unit well brought by the owners of unleased mineral interests in the production unit seeking their statutory share of production from the well is grounded in quasi-contract."); *Taylor v. Woodpecker Corp.*, 93-0781 (La. App. 1 Cir. 3/11/94); 633 So. 2d 1308, 1313; *Taylor v. David New Operating Co.*, 619 So. 2d 1251, 1253–56 (La. App. 3 Cir. 1993) (citing La. R.S. § 30:10(A)(3)); *Taylor v. Smith*, 619 So. 2d 881, 886–88 (La. App. 3 Cir. 1993)).

One type of quasi-contract involves the transaction of another's business, otherwise known as *negotiorum gestio*. As to section 10, the Louisiana First Circuit and Third Circuit have both held that a "unit operator acts as a *negotiorum gestor* or manager of the owner's business in selling the owner's proportionate share of oil and gas produced" pursuant to section 10(A)(3). *Woodpecker*

*Corp.*, 633 So. 2d at 1313 (citing *David New Operating*, 619 So. 2d at 1255 and *Smith*, 619 So. 2d at 887); *see also J & L Fam., L.L.C. v. BHP Billiton Petroleum Props. (N.A.), L.P.*, 293 F. Supp. 3d 615, 621 (W.D. La. 2018) (Foote, J.).

Louisiana Civil Code article 2292 provides that "[t]here is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances." La. Civ. Code art. 2292. The application of *gestio* law potentially opens the door to other rights and obligations. Pursuant to article 2297, "[t]he owner whose affair has been managed is bound to fulfill the obligations that the manager has undertaken as a prudent administrator and to reimburse the manager for all necessary and useful expenses." *Id.* art. 2297.

2. <u>Analysis</u>

BPX argues that whether or not section 10(A)(3) applies to Dow, the doctrine of *negotiorum gestio*—pursuant to Louisiana Civil Code article 2292, *et seq.*—allows for operators to recover post-production costs.[5] Dow counters that the only costs allowed to be deducted from its share are the costs specifically listed in section 10.

In the absence of an agreement with the operator, section 10 specifically lists expenditures incurred "drilling, testing, completing, equipping, and operating the well" as recoverable from an owner's share of production.[6] The parties agree that these costs are production costs and that the

---

[5] BPX also advances principles of co-ownership as an argument. However, because the Court concludes that *negotiorum gestio* applies, the Court need not reach the co-ownership theory.
[6] There has been no argument that either the supervision charge or risk charge are relevant at this time. *See TDX Energy*, 857 F.3d at 265–67. As stated above, an operator may collect a supervision charge and risk charge from a nonparticipating owner's share of production. La. R.S. § 30:10(A)(2)(b)(i) & (iii). As used in section 10, a nonparticipating owner can be a lessee who is unleased as to the operator or a completely unleased interest owner. *See id.* § 30:10(A)(2)(a)(i), (a)(ii), (b)(i), & (b)(iii). However, a completely unleased interest owner is exempt from the risk charge. *Id.* § 30:10(A)(2)(e)(i).

statute makes no reference to costs that could be characterized as post-production costs. According to Dow, the mention of production costs implies the exclusion of post-production costs.

However, the Court disagrees with Dow's position in this regard. The omission of post-production costs throughout section 10 makes sense. Aside from section 10(A)(3), the statute contemplates an owner receiving its share of *production*—i.e., the minerals in kind. Thus, the only costs incurred are those related to production because the owner is expected to receive its share of production and market the minerals itself.

Section 10(A)(3), on the other hand, contemplates a mineral owner receiving its share in cash. This provision governs when an operator proceeds with the sale of production if an owner has not made separate arrangements to dispose of its share of production. However, the provision does not list specific costs. Instead, section 10(A)(3) dictates when an owner is to be paid—within 180 days from the sale of production—and what the owner is to be paid—the owner's "pro rata share of the proceeds of the sale of production." La. R.S. § 30:10(A)(3). Nevertheless, the question remains whether post-production costs are excluded by the phrase "proceeds of the sale of production."

Another federal court in the Western District of Louisiana previously held that section 10(A)(3) precluded the deduction of post-production costs from an unleased interest owner's share of production proceeds. *See generally Johnson v. Chesapeake La., LP*, No. 16-1543, 2019 WL 1301985 (W.D. Mar. 21, 2019). Recently, however, Chief Judge Hicks granted a motion for reconsideration after the defendants argued for the first time that the doctrine of *negotiorum gestio*—pursuant to Louisiana Civil Code article 2292, *et seq.*—provided the mechanism for operators to recover post-production costs from unleased owners. *Johnson v. Chesapeake La., LP*, No. 16-1543, 2022 WL 989341 (W.D. La. Mar. 31, 2022); *see also Self v. BPX Operating Co.*, No.

CV 19-0927, 2022 WL 989345 (W.D. La. Mar. 31, 2022). After a thorough analysis, Chief Judge Hicks recognized that section 10(A)(3) and *gestio* law should be read *in pari materia* and concluded that nothing in section 10 precluded the application of *gestio* law.[7] *See generally Johnson*, 2022 WL 989341; *Self*, 2022 WL 989345. In conclusion, Chief Judge Hicks recognized that interpreting the phrase "proceeds of the sale of production" to preclude the deduction of post-production costs would lead to an absurd result—i.e., free riding.

When making an *Erie* guess, this Court is in agreement with Chief Judge Hicks that the doctrine of *negotiorum gestio* allows operators the mechanism and ability to recover post-production costs incurred by an operator to market the mineral interest owner's share of production.[8] The absurd result recognized by Chief Judge Hicks is only magnified when you consider this Court's conclusion that section 10(A)(3) applies to any interest owner who is unleased as to the operator.[9] Lessees have voluntarily entered into a contractual relationship whereby they are typically required to market the production. There simply would be no incentive for an interest owner to ever take in kind if the alternate option was a free ride after production. Such an absurd

---

[7] *Johnson* and *Self* both involve completely unleased interest owners whereas Dow is a lessee who is unleased as to the operator. Nevertheless, this Court has concluded that section 10(A)(3) applies equally to lessees who are unleased as to the operator. *See* Record Documents 41 & 124.

[8] In short, the Court rejects Dow's argument that the 1995 Civil Code revision changed *gestio* law. The phrasing "without authority" is meant to separate *gestio* law from mandate law because if contractual authority exists, the relationship would be better characterized as principal and mandatary. The authority here comes from what the Louisiana Supreme Court has described as a quasi-contractual relationship. *Wells*, 89 So. 3d at 1149. Additionally, the phrase "in the reasonable belief that the owner would approve of the action if made aware of the circumstances" subsumed the prior phrase "whether the owner be acquainted with the undertaking or ignorant of it."

[9] The Court, however, departs from Chief Judge Hicks to the extent his rulings could be read to imply that section 10(A)(3) is inapplicable to lessees like Dow. As stated in detail in prior rulings, this Court believes "unleased interests," as used in section 10, means "unleased by the operator." Any other interpretation would render the phrase "not subject to an oil, gas, and mineral lease" in section 10(A)(2)(e)(i) meaningless. *See* Record Documents 41 & 124.

result could not have been the intent of the Legislature. Thus, BPX's motion is **GRANTED** in this regard.[10]

### D.  Forfeiture Provision

Previously, BPX filed a partial motion to dismiss arguing that post-production costs are outside the scope of section 103.2's forfeiture provision. Record Document 7. The Court deferred ruling on the issue until after deciding whether post-production costs could be charged to mineral interest owners like Dow in the first place. Record Document 15. Now that the Court has answered the superseding question in the affirmative, the Court shall consider whether the phrase "costs of the drilling operations" includes post-production costs.

### 1. Relevant Statutes

In a forced pool unit, the operator is required to share information, upon request, with mineral interest owners who have no lease with the operator pursuant to section 103.1. *TDX Energy*, 857 F.3d at 259–64 (holding that "unleased interests" as used in sections 103.1 and 103.2 means "unleased by the operator"). Section 103.1 provides in pertinent part:

> A. Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas, or mineral lease, said operator or producer shall issue the following reports to the owners of said interests by a sworn, detailed, itemized statement:
>
> (1) Within ninety calendar days from completion of the well, an initial report which shall contain the costs of drilling, completing, and equipping the unit well.
>
> (2) After establishment of production from the unit well, quarterly reports which shall contain the following:
>
> (a) The total amount of oil, gas, or other hydrocarbons produced from the lands during the previous quarter.

---

[10] In this motion, the Court has not been asked to determine whether BPX acted prudently or exactly what post-production expenses qualify as "necessary and useful."

(b) The price received from any purchaser of unit production.

(c) Quarterly operating costs and expenses.

(d) Any additional funds expended to enhance or restore the production of the unit well.
. . .

D. Notwithstanding any other provision of this Section to the contrary, at the time a report is due pursuant to this Section, if the share of the total costs of drilling, completing, and equipping the unit well and all other unit costs allocable to an owner of an unleased interest is less than one thousand dollars, no report shall be required. However, during January of the next calendar year, the operator or producer shall report such costs to the owner.

La. R.S. § 30:103.1.

"Section 103.2 adds teeth to [section] 103.1; it disincentivizes operators' failure to comply with [section] 103.1's reporting requirements." *B.A. Kelly Land*, 25 F.4th at 376. Section 103.2 provides that when an operator fails to timely provide the information in section 103.1, such operator loses the "right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well."[11] La. R.S. § 30:103.2.

  2. <u>Analysis</u>

  BPX presents this as a *res nova* issue because it argues that no Louisiana or federal court has addressed the issue as presented in this case. It cites one Louisiana case where the court addressed a similar issue. In *XXI Oil & Gas*, the Louisiana Third Circuit Court of Appeal held that the forfeiture provision "includes both pre-production and post-production costs." 206 So. 3d at

---

[11] Section 103.2 provides in full:
  Whenever the operator or producer permits ninety calendar days to elapse from completion of the well and thirty additional calendar days to elapse from date of receipt of written notice by certified mail from the owner or owners of unleased oil and gas interests calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well.
La. R.S. § 30:103.2.

890. BPX, however, claims the court misused the term of art "post-production costs" because the court was discussing drilling and operating costs, which are production costs. BPX asserts that it is using the term post-production costs to mean marketing costs, a meaning different than that imposed by the Louisiana court in *XXI Oil & Gas*.

Dow counters that *XXI Oil & Gas* is directly on point and that post-production costs are included in the forfeiture provision. Further, Dow argues that it would be absurd to allow an operator to deduct post-production costs but then hide those costs from interest owners. Record Document 70 at 22.

Setting aside the difference in terminology, *XXI Oil & Gas* rejected BPX's narrow interpretation of the phrase "cost of the drilling operations of the well" and instead determined that the phrase broadly refers to the costs delineated in section 103.1(A)(1) & (2). 206 So. 3d at 889–90. In reaching that conclusion, the Louisiana Third Circuit compared the original statute with the amendment and determined that the Legislature used the phrase "cost of the drilling operations" to refer back to the expenditures referenced in section 103.1, "[o]therwise, there would be no incentive for the operator or producer to provide quarterly reports." *Id.* at 890.

The Court sees no reason to depart from *XXI Oil & Gas*'s reasoning in this regard. The Third Circuit's broader interpretation of "cost of the drilling operations of the well" aligns with the purpose of the statute. As the Fifth Circuit has recognized, the two statutes should be interpreted together. *See B.A. Kelly Land*, 25 F.4th at 376; *TDX Energy*, 857 F.3d at 263. "Section 103.2 adds teeth to [section] 103.1; it disincentivizes operators' failure to comply with [section] 103.1's reporting requirements." *B.A. Kelly Land*, 25 F.4th at 376. Therefore, it is logical to conclude that "cost of the drilling operations of the well" is broader than "drilling" costs and refers to the section 103.1 reports. Thus, this Court has not been convinced that *XXI Oil & Gas* takes an erroneous view

of the statute or misapplied "strict construction" when interpreting the forfeiture statute to be referring to costs listed in the section 103.1 reports.

However, the Court agrees with BPX that it is not entirely clear how the court in *XXI Oil & Gas* used the term "post-production" costs or if the court was referring to operations in the context of operating the well or overall operations. Additionally, it is not clear to this Court whether the revenue discussed in *XXI Oil & Gas* included deductions for post-production costs. Thus, the question remains whether operators are required to report post-production costs under section 103.1. If so, the Court believes such costs are incorporated in the forfeiture statute based on the reasoning in *XXI Oil & Gas*.

Section 103.1 requires an operator, upon request, to report costs attributable to drilling, equipping, and completing the well within ninety days after completion of the well. La. R.S. § 30:103.1(A)(1). After production has been established, the operator is obligated to provide quarterly reports, upon request, detailing the production of hydrocarbons, the price from any sale, quarterly operating costs and expenses, and "funds expended to enhance or restore the production of the unit well." *Id.* § 30:103.1(A)(2). According to Dow, "operating costs and expenses" and "funds expended to enhance . . . the production of the unit well" capture post-production costs. Record Document 70 at 21. This Court agrees.

The lay definition of "operating" is "of, relating to, or used for or in operations." "Operating." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/operating (last visited May 2, 2022). Thus, it stands to reason if marketing costs and other post-production costs form part of the business operations, they could fall under the general umbrella phrase "operating costs and expenses." Indeed, this appears to be the understanding employed by BPX's predecessor-in-interest as it included expenditures from

marketing, taxes, gathering, and transportation under the category of "operating expenses." Record Document 70-1 at 4. Nevertheless, BPX has presented authority that "operating expenses" refer to production costs in the context of an oil and gas lease and that as to an operator, they refer to the costs associated with maintaining production. *See J. Fleet Oil & Gas*, 2018 WL 1463529, at *6.

*J. Fleet Oil & Gas* referred to "operating expenses" as production costs at least in the context of expenditures incurred from "operating the well." *Id.* at *6–7. However, section 103.1 does not necessarily refer to operating expenses only in the context of operating a well. In fact, section 103.1 anticipates other business operations besides production activities, such as the sale of hydrocarbons. Therefore, a reasonable interpretation of "operating costs and expenses" could include certain post-production costs, if they are incurred as part of the overall business operations. As stated above, even BPX's predecessor-in-interest charged owners post-production costs under the category of "operating expenses."

Regardless, the Court does not believe it needs to decide whether section 103.1(A)(2)(c) is referring to "operating costs and expenses" only in the context of operating the well. Section 103.1(A)(2)(d) also contains a broad reporting requirement regarding "funds expended to enhance . . . production." Enhance means to "increase or improve in value, quality, desirability, or attractiveness." "Enhance." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/enhance (last visited May 2, 2022). Often minerals are "worthless" unless certain steps are taken to make the minerals valuable. *Merritt v. Sw. Elec. Power Co.*, 499 So. 2d 210, 213–14 (La. App. 2 Cir. 1986). These "subsequent to production" steps include transportation, marketing, processing, dehydration, treating, compression, and gathering. Thus, "post-production" costs can reasonably be described as "funds expended to enhance . . . production," as these costs are incurred to "improve" the "value, quality, desirability, or

attractiveness" of "worthless" production. As such, post-production costs are required to be reported in quarterly reports at least pursuant to section 103.1(A)(2)(d), assuming that they are not required to be reported through section 103.2(A)(2)(c).

The Court finds further support in this conclusion by viewing the exception to the reporting requirement when total costs are less than $1,000. Section 103.1(D) provides the following:

> Notwithstanding any other provision of this Section to the contrary, at the time a report is due pursuant to this Section, if the share of the total costs of drilling, completing, and equipping the unit well and *all other unit costs* allocable to an owner of an unleased interest is less than one thousand dollars, no report shall be required. However, during January of the next calendar year, the operator or producer *shall report such costs* to the owner.

La. R.S. § 30:103.1(D) (emphasis added).

In the provision, the phrase "such costs" refers to costs already mentioned—i.e., "costs of drilling, completing, and equipping the unit well and *all other unit costs*." *Id.* (emphasis added); *see* "Such." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/such (last visited May 2, 2022) (listing one definition as "of the character, quality, or extent previously indicated or implied"). "All" means "the whole amount, quantity, or extent of" or, in short, "every." "All." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/all (last visited May 2, 2022). As BPX has unwaveringly argued—and this Court agreed—"post-production" is one of the categories of costs allocable to an owner of an interest unleased by an operator, if such costs are incurred. Thus, based on the plain language of the statute, post-production costs are included in the phrase "all other" costs and must be reported to owners in a January report when all costs attributable to such owner are less than $1,000.

The Court can find no plausible explanation as to why the Legislature would require operators to report post-production costs when total costs are below $1,000 but not require operators

to report post-production costs when total costs equal or exceed $1,000. Therefore, the logical interpretation of section 103.1(A)(2) is that post-production costs must be reported in the quarterly reports and therefore are incorporated in the forfeiture provision.

The Court believes its resolution of the issue is also consistent with the purpose of the statutes. When read together, sections "103.1 and 103.2 address an information asymmetry that arises from the forced pooling of mineral resources when there is no lease or contract between the operator and the owner of the oil and gas interest." *B.A. Kelly Land*, 25 F.4th at 376. Sections "103.1 and 103.2 help remedy the information asymmetry by creating an enforceable mechanism for nonoperators that have unleased interests in the minerals to obtain an accounting of what the operator is doing." *Id.* The reports must be "detailed" and "itemized," La. R.S. § 103.1(A), and they must "relate the cost to the benefit: it must tell the unleased mineral owner what it is getting for its money." *TDX Energy*, 857 F.3d at 263. The purpose of the reporting requirement would be substantially defeated if operators could deduct post-production costs without any reporting oversight, as owners would not have a full "accounting of what the operator is doing."[12] *Id.*

In sum, the Court finds that "costs of the drilling operations" in section 103.2 refers back to the costs required to be reported in section 103.1 based on the reasoning in *XXI Oil & Gas*, "[o]therwise, there would be no incentive for the operator or producer to provide quarterly reports." 206 So. 3d at 890. Whether certain operators characterize post-production costs as operating expenses or separate expenses is of no moment when interpreting section 103.1. Section 103.1 requires operators to provide "detailed" and "itemized" reports, so the mineral owners can

---

[12] Assuming *arguendo* that BPX is correct that post-production costs are outside the scope of sections 103.1 and 103.2, the Court has not been convinced that such conclusion would be the end of the matter, considering the Court's determination that post-production costs are recoverable through the doctrine of *negotiorum gestio*. Indeed, *gestio* law *may* open the door to other rights and obligations. *See generally* La. Civ. Code arts. 2293–95 & 3003.

understand the deductions from revenue. Even if the phrase "operating costs and expenses," as used in section 103.1, only refers to production costs, the Court is persuaded that post-production costs can unambiguously be categorized as "funds expended to enhance . . . production."[13] Therefore, post-production costs must be detailed and itemized in the quarterly reports and thus are incorporated in the forfeiture provision. As such, BPX's motion is **DENIED** in this regard.

## CONCLUSION

Based on the foregoing reasons, BPX's partial motion for summary judgment [Record Document 59] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** to the extent the Court holds that the doctrine of *negotiorum gestio*—pursuant to Louisiana Civil Code article 2292, *et seq.*—allows operators the mechanism and ability to recover post-production costs incurred by an operator to market the mineral interest owner's share of production. It is **DENIED** to the extent the Court holds that post-production costs are included within section 103.2's forfeiture provision.

**THUS DONE AND SIGNED** this 5th day of May, 2022.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

---

[13] The Court notes that "operating costs and expenses" must mean something different from "funds expended to enhance . . . production" based on the rules of statutory interpretation. *Pumphrey*, 925 So. 2d at 1210 (citation omitted) ("Courts should give effect to all parts of a statute and should not give a statute an interpretation that makes any part superfluous or meaningless.").